UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(LONDON)

| | | |
|---|---|---|
| M.L.D., minor, by and through her Next Friend and Mother, Stacey Dozier, et al., | ) | Civil Action No. 6:23-CV-207-CHB |
| Plaintiffs, | ) | |
| v. | ) | **MEMORANDUM OPINION AND ORDER** |
| KAWASAKI MOTORS CORP., U.S.A., et al., | ) | |
| Defendants. | ) | |

*** *** *** ***

This matter is before the Court on three motions filed by Defendant Kawasaki Motors Corp., U.S.A. ("Kawasaki"): a Motion to Exclude Plaintiffs' Proposed Expert, Chris Walters ("Motion to Exclude Expert Testimony"), [R. 27]; a Motion for Summary Judgment, [R. 28]; and a Motion to Exclude the Affidavit of Chris Walters ("Motion to Exclude Affidavit"), [R. 34]. Plaintiffs M.L.D. and B.S.D., both minors, by and through their next friend and mother, Stacey Dozier,[1] and Plaintiff Stacie Kara-Lynn Blankenship filed a response to the Motion to Exclude Expert Testimony and the Motion for Summary Judgment, [R. 32][2], and Kawasaki filed a reply, [R. 35]. Plaintiffs did not file a response to the Motion to Exclude Affidavit, and the time to do so has passed. These motions are therefore ripe for review. For the reasons set forth below, the Court will grant each motion.

---

[1] Although M.L.D. was a minor when this suit was filed, she has since attained the age of majority. *See* [R. 31-1, p. 9:18–21]; *Link v. Link*, No. 2025-CA-0790-MR, 2026 WL 1838803, at *1 (Ky. Ct. App. June 26, 2026) ("Under Kentucky Revised Statutes (KRS) 2.015, the age of majority in Kentucky is eighteen."). No party, however, has moved the Court to remove Ms. Dozier as the named plaintiff or to substitute M.L.D. as the real party in interest. *See, e.g.*, *Wilson v. Luttrell*, Nos. 99-5459, 99-5460, 99-5461, 99-5462, 2000 WL 1359624, at *10 (6th Cir. Sep. 13, 2000). The Court thus retains the original party designations and refers to M.L.D. by her initials throughout this opinion and order.

[2] Plaintiffs filed a response, [R. 31], followed by an amended response, [R. 32].

## I. BACKGROUND

This action arises from a single-vehicle rollover incident in which Plaintiffs suffered bodily injuries. *See* [R. 1-2]. On March 3, 2020, James Dozier purchased a new Kawasaki Teryx, an offroad utility vehicle commonly referred to as a "side-by-side." [R. 28-4, pp. 17:18–19:11, 83:10–85:8].[3] A permanent warning label affixed to the driver's side of the vehicle stated, among other things, "Make sure operators are 16 or older with a valid driver's license," and, "Do not allow operation on public roads (unless designated for off-highway vehicle access)[;] collisions with cars and trucks can occur." [R. 28-3, p. 12]; [R. 28-6]; [R. 28-4, pp. 26:19–27:23]; [R. 31-1, pp. 19:10–20:12]; [R. 31-3, pp. 18:14–18, 51:19–21].

Mr. Dozier purchased the side-by-side for the use of his three children, M.L.D., B.S.D., and C.D. [R. 28-4, pp. 8:11–9:5, 17:17–18:8, 20:9–13]. Between March 2020 and February 2021, the children used the side-by-side primarily to drive on the roads near where they lived in Gray, Kentucky, but they also used it to ride on nearby trails. *Id.* at 28:17–31:2; [R. 31-1, pp. 28:5–18].

On February 21, 2021, M.L.D. was driving the side-by-side on paved roads near Gray; B.S.D. was in the passenger seat, and the children's cousin, Ms. Blankenship, was in the back seat. [R. 28-4, pp. 6:21–25, 37:15–19, 39:9–23]; [R. 31-1, pp. 26:8–33:23]; [R. 31-2, p. 17:1–11]; [R. 31-3, pp. 24:12–25:17]. M.L.D. was fourteen years old; B.S.D. was twelve; and Ms. Blankenship was seventeen. [R. 31-1, pp. 9:22–10:1]; [R. 31-2, p. 8:12–14]; [R. 31-3, p. 8:6–18]. Ahead of M.L.D., the children's mother was driving a different side-by-side, and C.D. was riding a dirt bike. [R. 28-4, pp. 12:12–18, 39:24–40:5]; [R. 31-1, pp. 34:23–36:6;] [R. 31-3, pp. 24:25–25:8].

---

[3] Throughout this opinion and order, the Court's citations to deposition transcripts reference the page numbers listed on the transcripts.

Shortly after M.L.D. turned onto Route 233 from a smaller road, she felt the side-by-side "steering to the right," and "after that, [the side-by-side] just flipped." [R. 28-4, pp. 41:25–43:18, 67:13–68:4; R. 31-1, pp. 33:4–34:5; R. 31-2, p. 17:18–23; R. 31-3, pp. 26:8–27:10; R. 28-3]. M.L.D. testified in her deposition that she believed, apparently based on what she had been told by adults, that the crash occurred because "something" on the side-by-side "broke." [R. 31-1, pp. 76:10–77:12]. Plaintiffs cannot recall whether M.L.D. tried to apply the brakes or turn the steering wheel back to the left prior to the rollover. [R. 31-1, pp. 34:13–22]; [R. 31-2, p. 19:22–24]; [R. 31-3, pp. 28:21–29:1]. Plaintiffs estimate that the side-by-side was traveling at around twenty-five to thirty miles per hour when it rolled over. [R. 31-1, p. 34:6–12]; [R. 31-3, p. 29:12–14]. The side-by-side came to rest upside down, and Plaintiffs, who were all wearing seatbelts, remained suspended inside the vehicle. [R. 31-1, pp. 39:16–40:20]; [R. 31-2, pp. 18:21–19:2, 20:4–16]; [R. 31-3, pp. 27:11–16, 29:15–23]. Plaintiffs suffered various injuries in the rollover, including bumps, bruises, cuts, a fractured humerus (suffered by B.S.D.), and a concussion (suffered by Ms. Blankenship). [R. 31-1, pp. 43:23–48:12, 92:23–94:2]; [R. 31-2, pp. 23:5–24:8]; [R. 33-3, pp. 32:4–38:8].

Plaintiffs and Kawasaki agree that post-rollover inspections of the side-by-side revealed significant damage to several components of the rear-left wheel assembly of the side-by-side, including the knuckle, the bearing assembly, and the wheel itself. *See* [R. 28, pp. 1–2]; [R. 32, pp. 1–2, 6–7]. The parties disagree, however, about the cause of that damage. Plaintiffs and their proposed expert argue that a manufacturing defect caused the knuckle to fracture "on its own," which in turn caused the side-by-side to become uncontrollable and ultimately to rollover. *See, e.g.*, [R. 32, pp. 6–7]; [R. 28-1 (Walters Report)]. Kawasaki and its proposed experts argue that the damage to the rear-left wheel assembly was caused by Plaintiffs' misuse of the side-by-side

and/or by the rollover itself. *See, e.g.*, [R. 28, p. 9]; [R 28-2 (Umberger Report)]; [R. 28-3 (Breen Report)].

Plaintiffs filed a complaint against Kawasaki Tennessee, Inc., in Knox Circuit Court on February 9, 2022. [R. 1-2]; [R. 1-3]. On March 11, 2022, Plaintiffs filed an amended complaint instead naming Kawasaki Motor Corp., U.S.A., as the sole defendant. [R. 1-2]; [R. 1-3]. The amended complaint alleges a manufacturing defect, a design defect, and a failure to warn, each related to the February 2021 rollover incident. [R. 1-2, pp. 11–15]. Plaintiffs served the amended complaint on Kawasaki on November 16, 2023. *See* [R. 1]; [R. 1-1]. Kawasaki timely removed the action, invoking this Court's diversity jurisdiction. [R. 1]; *see* 28 U.S.C. §§ 1332, 1441, 1446.

Kawasaki filed its Motion to Exclude Expert Testimony and Motion for Summary Judgment on September 15, 2025. [R. 27]; [R. 28]. Plaintiffs filed their response to those motions on September 26, 2025, [R. 31], followed by an amended response on September 29, 2025, [R. 32]. Attached to Plaintiffs' response was an affidavit completed by their proposed expert, Mr. Walters, on September 25, 2025, the day before Plaintiffs filed their first response. [R. 31; R. 31-6]. On October 10, 2025, Kawasaki filed both a motion to exclude that affidavit and a reply to Plaintiffs' response. [R. 34]; [R. 35]. Plaintiffs did not respond to the Motion to Exclude Affidavit. Kawasaki's three motions are now ripe for the Court's review.

## II. ANALYSIS

### A. Motion to Exclude Affidavit, [R. 34]

In its Motion for Summary Judgment, Kawasaki argues that Plaintiffs cannot succeed on their product-liability claim without admissible expert testimony. [R. 28]. Kawasaki further argues that the report and testimony of Plaintiffs' proposed manufacturing-defect expert, Mr. Walters, should be excluded because Mr. Walters is not qualified and his opinions are not reliable. *Id.*;

[R. 27 (Motion to Exclude Expert Testimony)]. Plaintiffs, in response to both motions, rely heavily on the affidavit completed by Mr. Walters on September 25, 2025, the day before Plaintiffs filed their first response. [R. 32]; [R. 31-6 (Walters Affidavit)]; *see* [R. 31]. Kawasaki now seeks to exclude Mr. Walters's affidavit as untimely and otherwise inadmissible under the Federal Rules of Evidence and the sham-affidavit doctrine. [R. 34 (Motion to Exclude Affidavit)]. Thus, before addressing Kawasaki's Motion to Exclude Expert Testimony and Motion for Summary Judgment, the Court will first address Kawasaki's Motion to Exclude Affidavit.

The Court notes that because Plaintiffs did not respond to the Motion to Exclude Affidavit, the Court considers the motion to be unopposed. That alone is a sufficient reason to grant the motion and exclude the affidavit. *See* L.R. 7.1(c); *Jones v. Louisville/Jefferson Cnty. Metro Govt.*, No. 18-CV-265, 2023 WL 7287291, at *7 (W.D. Ky. Nov. 3, 2023) (granting a motion to exclude expert testimony as unopposed where no response was filed).

Moreover, the affidavit is clearly untimely. Under Federal Rule of Civil Procedure 26(a)(2), "[a] party must make [expert] disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). On January 12, 2024, the Court entered a Scheduling Order requiring the plaintiffs to disclose the identity of their expert witnesses and any reports or summaries required by Rule 26(a)(2) no later than January 17, 2025. [R. 13, ¶ 3]. The Court later extended the expert-discovery deadline to August 18, 2025. [R. 24].

Plaintiffs disclosed Mr. Walters as a proposed expert on January 26, 2024. [R. 14, p. 4]. According to that disclosure, Mr. Walters was expected to testify that he is a side-by-side and motorcycle repair technician who inspected the side-by-side on January 27, 2022, and found that "the left-rear wheel bearing carrier [i.e., the knuckle[4]] was broken in two and it appeared to be a

[4] The record indicates that Mr. Walters uses the terms "wheel bearing carrier" and "knuckle" interchangeably. *See, e.g.*, [R. 34-2, pp. 118:1–10, 137:22–143:3]; [R. 28-2, p. 14].

manufacturer defect as there were no signs of misuse of the unit and it was not modified." *Id.* He was also expected to testify that "his inspection revealed stock tires and rims," that "the wheel bearing carrier should not have broken in two like it did," and that "when the left-rear wheel bearing carrier broke in two, it allowed the left-rear wheel to move in a way it which it was not designed to do and it made the unit uncontrollable at the time of its operation causing the side by side to wreck and/or rollover." *Id.* at 4–5. Plaintiffs' disclosure cited and recounted statements in Mr. Walters's "initial report," which is a "service ticket" and estimate for repair work. *See* [R. 27-1]. In a deposition taken on July 29, 2025, Mr. Walters offered some additional details about his initial inspection and stated that he had reexamined the side-by-side the day before the deposition. [R. 34-2, pp. 32:5–36:23, 110:12–115:7, 118:1–119:21, 122:18–124:4, 137:7–143:17]. He also testified, however, that he "[hadn't] really learn[ed] anything new" during the reexamination and that the statements in the service ticket reflected his "final opinions." *Id.* at 46:9–47:9, 48:16–49:5.

Neither party disputes the timeliness of Plaintiffs' disclosure or of Mr. Walters's initial report and deposition. However, the content of Mr. Walters's affidavit—which was completed well after the deadline for expert discovery had passed *and* after Kawasaki had filed its motion to exclude his report and testimony—goes beyond that of his initial report and deposition. In the affidavit, Mr. Walters states for the first time that his initial examination of the side-by-side had revealed "a large area of destruction" on the "left rear bottom A-arm." [R. 31-6, p. 2]. He then posits—again for the first time—that his inspections of the side-by-side had led him to believe that the rollover had not caused any damage to the rear of the side-by-side and that that damage had instead been caused by the alleged manufacturing defect. *Id.* at 3–4. He also reports that he examined the side-by-side for a third time on September 24, 2025—the day before the affidavit

was completed—and that during that examination, he cleaned and photographed the rear-left A-arm mechanisms of the side-by-side for the first time. *Id.* at 2–4. Finally, he states that he performed online research and learned of "numerous reports of people having problems with rear axles, wheel bearing, and knuckles" on their Kawasaki Teryxes as well as "some manufacturer recalls on the 2020 Kawasaki Teryx 4 related to a bolt tightening issue." *Id.* at 4. Put simply, Mr. Walters's affidavit references information and introduces opinions that were not offered or identified in his initial report or deposition.

True, Rule 26(e) provides that "[a] party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure . . . if the party learns that in some material respect the disclosure . . . is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1). However, Rule 26(e) neither "contemplate[s] supplying wholly missing information," *Eiben v. Gorilla Ladder Co.*, No. 11-CV-10298, 2013 WL 1721677, at *5 (E.D. Mich. Apr. 22, 2013), nor "give[s] the producing party a license to disregard discovery deadlines and to offer new opinions under the guise of the supplement label," *id.* (quoting *Allgood v. Gen. Motors Corp.*, No. 02-CV-1077, 2007 WL 647496, at *3 (S.D. Ind. 2007)). That is "especially true when the information underlying the new opinion was available to the party at the time of her initial disclosure." *Bentley v. Highlands Hosp. Corp.*, No. 15-CV-97, 2016 WL 5867496, at *4 (E.D. Ky. Oct. 6, 2016); *see also Good v. Biolife Plasma Servs., L.P.*, No. 18-CV-11260, 2021 WL 2550853, at *6 (E.D. Mich. June 22, 2021) ("Rule 26(e) . . . does not cover failures of omission because the expert did an inadequate or incomplete preparation." (quoting *Bowles v. City of Mansfield*, No. 07-CV-2276, 2008 WL 11480485, at *2 (N.D. Ohio Nov. 21, 2008))); *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 681 (6th Cir. 2011) (explaining that "[d]istrict courts have broad discretion to exclude untimely disclosed expert-witness testimony, particularly when these reports serve as a transparent attempt to reopen the

[admissibility] inquiry after the weaknesses in the expert's prior testimony have been revealed" (first alteration in original) (internal quotation marks omitted) (quoting *Pride v. BIC Corp.*, 218 F.3d 566, 578–79 (6th Cir. 2000))). Here, Mr. Walters's affidavit is an untimely attempt to introduce new information gathered well after the deadline for expert discovery. It is not a proper supplement under Rule 26(e).[5]

Rule 37(c)(1) addresses the penalties for a party's failure to comply with the disclosure deadlines set out in Rule 26. Rule 37(c)(1) provides, in relevant part,

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed R. Civ. P. (37)(c)(1). That rule "requires absolute compliance with Rule 26(a); that is, it mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified." *Parton v. Johnson & Johnson*, No. 18-CV-419, 2021 WL 3921339, at *4 (E.D. Tenn. Sep. 1, 2021) (quoting *Hunt v. Hadden*, 127 F. Supp. 3d 780, 789 (E.D. Mich. 2015), *aff'd*, 665 F. App'x 435 (6th Cir. 2016)). The burden of demonstrating that a violation was harmless or substantially justified rests on the potentially sanctioned party. *See id.* If that party fails to meet its burden, "exclusion of expert testimony is the standard sanction." *Id.* (quoting *Hunt*, 127 F. Supp. 3d at 789). Here, Plaintiffs did not respond to the motion and thus cannot satisfy their burden of demonstrating either harmlessness or a substantial justification. Indeed, as noted above, the Court considers the motion to be simply

[5] Nor is the affidavit proper rebuttal evidence under Rule 26(a)(2)(D)(ii), which requires rebuttal disclosures to be made "within 30 days after the other party's disclosure." Fed. R. Civ. P. 26(a)(2)(D)(ii). The identities and reports of Kawasaki's proposed manufacturing-defect experts were disclosed on April 18, 2025, months before Mr. Walters completed his affidavit. *See* [R. 34-6].

unopposed. Accordingly, the Court will exercise its "broad discretion" to exclude Mr. Walters's untimely affidavit. *See Pluck*, 640 F.3d at 680–81.[6]

**B. Motion to Exclude Expert Testimony, [R. 27]**

The Court next considers Kawasaki's Motion to Exclude Expert Testimony. [R. 27]. Kawasaki argues that Plaintiffs' proposed expert, Mr. Walters, is not qualified to offer expert testimony regarding the alleged manufacturing defects and that Mr. Walters's opinions are unreliable. *Id.*; [R. 35 (Reply in Support of Motion for Summary Judgment and Motion to Exclude Expert Testimony)]. Plaintiffs' attempts to rebut these allegations rely in large part on Mr. Walters's September 25, 2025, affidavit. *See* [R. 32, pp. 16–22]. However, the Court has excluded that affidavit and thus does not consider its contents in addressing this motion. The Court next summarizes Mr. Walters's report and deposition testimony and then addresses Kawasaki's Motion to Exclude Expert Testimony.

As noted above, Mr. Walters's "initial report" is in fact a "service ticket" pertaining to Plaintiffs' side-by-side. In its entirety, the report reads as follows:

> Customer stated unit was wrecked because something had broke[n] and made driver wreck. Upon inspection of unit I foun[d] that the left rear wheel bearing carrier has broke[n] in two. Looks to be a manufacturer defect. There were no signs of mis[]use of the unit. It hasn't been modified and has stock tires and rim carrier. [It] should not have broke[n] in[ two] like it did. When carrier broke in two it allowed rear wheel to move in way it shouldn't and ma[d]e unit uncontrollable at time of riding[,] causing [it] to have wreck. Frame is also bent but [cannot] find a part number for frame. Quote does not reflect a frame and labor for replacement. Labor and parts would go up a[ ]lot if frame and labor for frame replacement is done.

[6] Because the Court excludes the affidavit as untimely and improper under Rules 26 and 37, it need not address Kawasaki's arguments that the affidavit should be excluded under the Federal Rules of Evidence and the sham-affidavit doctrine.

[R. 27-1] (capitalization modified). Attached to the "report" are a quote for the repair of the side-by-side; four certificates related to Mr. Walters's training as a mechanic; and three photographs depicting the broken knuckle, still attached to the side-by-side. *Id.*; *see* [R. 27-5, pp. 15–16].

In his deposition, Mr. Walters provided additional information about his background, his inspection of the side-by-side, and his conclusion that there was a manufacturing defect in the left rear knuckle. The Court summarizes Mr. Walters's deposition testimony as follows.

Mr. Walters has worked full time as a mechanic since 2007, except for a brief period of unemployment and a two-year stint working in a factory around 2016–2017. [R. 27-5, pp. 51:9–53:22, 64:2–71:19, 87:16–92:4]. Throughout his career as a mechanic, Mr. Walters has worked for a variety of motor-vehicle dealers and repair shops; since May 2020, he has worked full time as the owner, operator, and mechanic of the Bearded Guy Garage. *Id.* at 51:9–53:22, 67:2–71:19, 87:16–92:4. Mr. Walters has worked primarily on offroad vehicles such as four wheelers and side-by-sides, although he has also worked on road motorcycles and outdoor power equipment, such as lawnmowers and chainsaws. *Id.* at 54:15–57:4, 67:13–83:16, 89:8–14, 92:5–12.

Mr. Walters has no training or experience with respect to mechanical engineering or metallurgy. *Id.* at 95:16–96:23, 107:19–110:4. He has never conducted a stress analysis or a finite-element analysis on a metal component, examined a metal component under a microscope, or otherwise participated in metallurgical testing. *Id.* at 107:19–110:4. He is not familiar with the standards or tolerances under which the components of Plaintiffs' side-by-side were designed and tested. *Id.* at 106:9–110:8.

Turning to this case, Mr. Walters inspected the side-by-side for about two hours in January 2022. *Id.* at 32:5–33:2, 110:12–18, 123:23–124:4. During that inspection, Mr. Walters spoke to Mr. Dozier, who owns the side-by-side but was not present for the rollover, and visually examined

the side-by-side. *Id.* at 32:5–36:23, 110:12–111:5, 123:23–124:4. Mr. Walters took several photographs and used a flashlight to look at parts of the side-by-side, but he did not get underneath the side-by-side to examine its undercarriage. *Id.* at 32:5-36:23. He did not disassemble any portion of the side-by-side or perform any kind of metallurgical or other testing on any of its components. *Id.* at 34:4–35:3, 114:18–117:6, 122:11–126:22, 211:24–212:5.

Based on his initial inspection, Mr. Walters concluded that a manufacturing defect in the rear-left knuckle of the side-by-side had caused the knuckle to break while M.L.D. was driving the side-by-side and that the broken knuckle had caused the side-by-side to become uncontrollable and to roll over. *Id.* at 110:12–111:22, 118:1–119:21, 122:18–124:4, 137:7–143:17. In reaching that conclusion, Mr. Walters reasoned that (1) when he inspected the side-by-side, the knuckle was broken; (2) the side-by-side did not appear to have been modified, "mistreated[,] or roughhoused," such that a prior incident could have caused any damage to the knuckle; and (3) if the knuckle had broken while M.L.D. was driving, there would have been "nothing holding [the] wheel to be able to stay straight like it's supposed to," and the axle would have been "the only thing holding [the wheel] from leaving," which would have made the side-by-side "uncontrollable." *Id.* at 118:1–119:21, 122:18–124:4, 137:7–143:17. Mr. Walters speculated that a defect in the knuckle could have resulted from "a bad casting" or from too much pressure being applied "when the bearing was pressed in," which "could have caused . . . a hairline crack," but he did not observe any evidence of either a bad casting or a hairline crack in the knuckle.[7] *Id.* at 116:18–126:22, 137:7–141:19.

[7] Plaintiffs' counsel also engaged Mr. Walters in an extended discussion pertaining to a photograph that purportedly showed a "gouge" in the road caused by the rollover incident. [R. 27-5, pp. 167:5–181:2, 189:7–191:24]. Mr. Walters testified that the photograph supported his theory of the knuckle fracture because "the only way the gouge would've been there [would have been] from the [knuckle] break[ing] and let[ting] the front—let[ting] the frame or the A-arm hit and gouge." *Id.* at 173:2–5. However, Mr. Walters later testified that he did not know who took the photograph, when it was taken, or whether it depicted the section of the road where the rollover had occurred, *id.* at 195:5–24, and there was no other evidence or testimony about the origins of, or content depicted in, the photograph. Although

On July 28, 2025, the day before his deposition, Mr. Walters visually inspected the side-by-side for a second time, but he "didn't really learn anything new." *Id.* at 46:9–47:9, 48:16–49:5. That same day, he drove to the where the rollover had occurred and, without getting out of his car, "just kind of went by and looked at the road a little bit, drove it and left." *Id.* at 57:15–60:23. At no point before his deposition did Mr. Walters speak with any of the plaintiffs or anyone else who was present when the rollover occurred. [R. 34-2, pp. 112:5–114:19, 144:24–145:1].

The Court now addresses Kawasaki's motion to exclude Mr. Walters's report and testimony. The Court first notes that the report and testimony are excludable based solely on Plaintiffs' failure to comply with Rule 26(a)(2)(B). When a witness is retained by a party to provide expert testimony, the party's initial disclosure of the witness "must be accompanied by a written report" that contains, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them"; "the facts or data considered by the witness in forming them"; and "any exhibits that will be used to summarize or support them." Fed. R. Civ. P. 26(a)(2)(B)(i)-(iii). To comply with those requirements, a report must "'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation." *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) (quoting *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 657 (6th Cir. 2005)). In other words, a report must describe "'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *Id.* (quoting *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998)); *accord Adkins v. Marathon Petroleum Co., LP*, 105 F.4th 841, 850 (6th Cir. 2024). Ultimately, a report "must be

---

photographs may, "[i]n appropriate circumstances, . . . provide sufficient information for an expert to apply his knowledge and experience and form an opinion," *Drake v. Crete Carrier Corp.*, No. 23-CV-01021, 2026 WL 21904, at *3 (E.D. Tex. Jan. 5, 2026), any opinions Mr. Walters formed on the basis of this photograph—admittedly without knowing when it was taken or what it depicted—are patently unreliable, *see* Fed. R. Evid. 702. Accordingly, the Court gives no weight to the discussion regarding the "gouge" in the road in its analysis of Mr. Walters's deposition testimony.

complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources." *R.C. Olmstead*, 606 F.3d at 271 (quoting *Salgado*, 150 F.3d at 742 n.6). When the report of a proposed expert fails to meet the requirements of Rule 26(a)(2)(B), the witness's report and testimony may be excluded under Rule 37(c)(1). *See, e.g.*, *id.* at 270-72; *Adkins*, 105 F.4th at 850.

Here, Mr. Walters was retained by Plaintiffs to provide expert testimony, [R. 34-2, p. 29:10–13], so he was required to complete a written report in compliance with Rule 26(a)(2)(B).[8] For that purpose, Mr. Walters's report was plainly deficient. The "report" consists of a single paragraph and contains little more than Mr. Walters's conclusory opinions. [R. 27-1]. The report suggests that Mr. Walters performed some kind of "inspection," but it does not include any information about what that inspection entailed. *Id.* It does not, for example, indicate whether the inspection was merely visual or whether it included any kind of testing, and it does not indicate which components of the side-by-side Mr. Walters "inspected." *Id.* In other words, the report offers essentially no information about the "facts or data" that Mr. Walters relied upon to form his opinions. *Cf.* Fed. R. Civ. P. 26(a)(2)(ii). Moreover, the report gestures vaguely toward the reasoning that Mr. Walters used to develop his opinions, but it falls well short of providing "a line of reasoning arising from a logical foundation," as required by Rule 26(a)(2)(i). *See R.C. Olmstead,* 606 F.3d at 271 (quoting *Brainard*, 432 F.3d at 657). Put simply, Mr. Walters's initial report

[8] Although a mechanic who has performed work on a party's vehicle may testify to that work without needing to complete a written report, a mechanic who has been retained to testify as an expert witness certainly must do so. *Cf. Ramsey v. Lowe's Home Ctrs., LLC*, No. 24-CV-001, 2025 WL 2577791, at *17 (E.D. Ky. Sep. 5, 2025) ("[I]f [a] physician formed his opinion at the request of the patient's counsel and in anticipation of litigation, courts should treat the physician as a retained expert and require compliance with Rule 26, including the production of a report, as required by Rule 26(a)(2)(B)." (alterations and internal quotation marks omitted) (quoting *Adkins*, 105 F.4th at 849)). Here, because Mr. Walters was contacted by Plaintiffs' attorney to "do an estimate in the case and give an expert witness advice," [R. 34-2, p. 29:10–13], he was a retained expert and was required to file a written report in accordance with Rule 26(a)(2)(B).

provides few clues about both "how" and "why" Mr. Walters developed the conclusory opinions expressed in the report. *See id.* This alone is reason to exclude Mr. Walters's report and testimony. *See, e.g.*, *Adkins*, 105 F.4th at 850 (concluding that an expert's report and testimony were properly excluded because the expert's report was "conclusory and [did] not meet the level of rigor and detail that Rule 26 requires"); *R.C. Olmstead*, 606 F.3d at 270–72; *Hubble v. County of Macomb*, No. 16-CV-13504, 2019 WL 1783043, at *5–6 (E.D. Mich. Apr. 23, 2019).

Despite these facial deficiencies in Mr. Walters's "initial report," Kawasaki does not argue that Mr. Walters's report and testimony should be excluded based solely on the sparsity of the report. *See* [R. 27]. Instead, Kawasaki relies heavily on Mr. Walters's deposition to argue that his report and testimony should be excluded. *See id.* Accordingly, the Court will look beyond Rule 26(a)(2) and address Kawasaki's arguments that Mr. Walters's report and testimony are inadmissible under Federal Rule of Evidence 702. *Cf. Good*, 2021 WL 2550853, at *6 ("While the disclosure obligations under Rule 26(a)(2) serve to prevent an 'ambush at trial' and to 'shorten or decrease the need for deposition,' courts of this circuit have repeatedly held that 'those concerns can become moot when a deposition is actually taken.'" (first quoting *R.C. Olmstead*, 606 F.3d at 271; then quoting *United States v. Roberts*, 830 F. Supp. 2d 372, 387 (M.D. Tenn. 2011))).

When a case invokes the Court's diversity jurisdiction, the question of admissibility of expert testimony is governed by federal standards. *Ramsey v. Lowe's Home Ctrs., LLC*, No. 24-CV-001, 2025 WL 2577791, at *3 (E.D. Ky. Sep. 5, 2025). As a result, Rule 702, which governs the use of expert testimony in federal court, guides the Court's analysis. That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Based on this language, the Sixth Circuit has explained that an expert's opinion is admissible only if it satisfies three requirements:

> First, the witness must be qualified by "knowledge, skill, experience, training, or education." Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Third, the testimony must be reliable.

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008) (citing and quoting Fed. R. Evid. 702). The trial judge ultimately serves as a "gatekeeper, ensuring that expert testimony satisfies the requirements of reliability and relevance." *Ramsey*, 2025 WL 257791, at *5 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). The proponent of the testimony, however, bears the burden of establishing its admissibility by a preponderance of proof. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

The Court understands that Kawasaki challenges Plaintiffs' ability to satisfy the first and third of Rule 702's requirements: qualification and reliability.[9] *See* [R. 27, pp. 16–26]. The Court begins and ends its discussion with reliability.

Rule 702 guides trial courts by providing general standards to assess reliability: whether "the testimony is based on sufficient facts or data," "whether the testimony is the product of reliable principles and methods," and whether "the expert's opinion reflects a reliable application

[9] Although Kawasaki invokes the language of relevancy and asserts that Mr. Walters's report and testimony would "not assist the trier of fact," [R. 27, pp. 1, 26], the Court does not understand Kawasaki to be arguing that Mr. Walters's report and testimony, if otherwise admissible, would not be relevant to the jury's determination of whether there was a manufacturing defect, *see id.* at 19, 23.

of the principles and methods to the facts of the case." Fed. R. Evid. 702; *see, e.g.*, *Ramsey*, 2025 WL 2577791, at *4. Although the Supreme Court in *Daubert* provided a checklist of factors to guide a court's analysis of reliability, including "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community," *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (internal quotation marks omitted) (citing *Daubert*, 509 U.S. at 593–94), the Sixth Circuit has recognized that "'the distinction between scientific and non-scientific expert testimony is a critical one,' and that *Daubert* is 'only of limited help' in assessing technical or experiential expertise." *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 334 (6th Cir. 2001) (alterations omitted) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1349 (6th Cir. 1994)); *see also In re Scrap Metal*, 527 F.3d at 529 ("[T]he *Daubert* factors 'are not dispositive in every case' and should be applied only 'where they are reasonable measures of the reliability of expert testimony.'" (quoting *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001))). Regardless of whether an expert's opinion is scientific or non-scientific, however, "[t]he concept of reliability implies that an expert's opinion must be based on something more than subjective belief or unsupported speculation. Rather, a reliable opinion requires that the expert use (1) a reliable methodology, and (2) base his or her opinion on reliable facts or data." *Ramsey*, 2025 WL 2577791, at *6 (internal quotation marks omitted) (quoting *Navarro v. Procter & Gamble Co.*, 501 F. Supp. 3d 482, 489 (S.D. Ohio 2020)). Thus, "if an expert witness relies 'solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Antioch Co. Litig. Tr. v. Morgan*, 633 F. App'x 296, 300 (6th Cir. 2015) (quoting Fed. R. Evid. 702 advisory committee's notes to 2000 amendments).

Kawasaki argues that Mr. Walters's opinions are not reliable because he (1) "failed to provide any basis to find that his methods of visually inspecting the [side-by-side] to determine the existence of a manufacturing defect in the casting of the rear knuckle ha[ve] been tested, accepted, or used by other experts in the field of mechanical engineering, metallurgy, or accident reconstruction," [R. 27, p. 20–26]; *accord* [R. 35, pp. 8–9]; and (2) "identified no specific defect [in the knuckle] . . . and failed to eliminate or meaningfully consider several obvious alternatives (e.g. damage occurring during the rollover or due to impact)," [R. 27, pp. 4, 13]. Plaintiffs, in response, emphasize that Mr. Walters's opinions are "based upon 18 years of experience, skill, knowledge, education and common sense" and argue, rather conclusorily, that Mr. Walters's visual inspection of the side-by-side, as described in his deposition testimony, provided him with a sufficient basis to conclude that a manufacturing defect caused the knuckle to fracture and that the knuckle fracture could have caused the side-by-side to become uncontrollable and to roll over. [R. 32, p. 17].

Kawasaki correctly argues that Mr. Walters had no basis to reliably conclude that there was any kind of particular defect, including a casting defect, in the rear-left knuckle. To reliably form that kind of opinion, Mr. Walters likely would have needed to employ some of the metallurgical methods referenced in Kawasaki's briefs: "laboratory testing, microscopy, measurements, calculations, or exemplar testing." [R. 27, pp. 20–23]; *accord* [R. 35, pp. 8–9]; *see, e.g.*, *Whybark v. Synthes, Inc.*, No. 15-CV-084, 2017 WL 1788673, at *5 (W.D. Ky. May 4, 2017) (concluding that an orthopedic surgeon's opinion that a bone screw broke as a result of a manufacturing defect was unreliable because the surgeon "did not review any of the manufacturing records for the device, . . . did not know what type of quality control [the manufacturer] used in the manufacture of these particular screws, and . . . did not cite any orthopedic or biomedical principles to support

his opinion that the product was, or possibly was, defective"). At the very least, Mr. Walters would have needed to identify *some* affirmative evidence in support of his theory, and he admitted in his deposition that he did not observe any evidence of either a bad casting or a hairline fracture consistent with a manufacturing defect and that his opinion was ultimately based on little more than his own "belie[f]":

> [A]s far as what I could visually see . . . , it didn't look like it was a bad casting. But as far as the way it was casted, I—I believe—I believe it was a manufacture defect. . . . I mean, the metal may not have—I'm—like I said, there again, I'm not a metal professional. But I—I truly do believe it was a manufacture defect in that part.

[R. 28-1, pp. 118:2–119:3]; *see also id.* at 119:4–122:17, 124:5–126:22. Thus, Mr. Walters's opinion that there was a casting defect in the knuckle is plainly unreliable. *See, e.g.*, *Ramsey*, 2025 WL 2577791, at *6 ("The concept of 'reliability' implies that an expert's opinion must be based on something 'more than subjective belief or unsupported speculation.'" (quoting *Navarro*, 501 F. Supp. 3d at 489)).

In sum, Mr. Walters's "initial report" was plainly inadequate under Rule 26(a)(2)(B), and his report and testimony could be excluded on that ground alone. Moreover, Mr. Walters provided almost no explanation for his opinion that there was a casting defect in the knuckle, and the explanation he did provide indicated that his opinion was ultimately based on no more than his subjective beliefs. The Court, in its role as evidentiary gatekeeper under Rule 702, will therefore grant Kawasaki's Motion to Exclude Expert Testimony.

**C. Motion for Summary Judgment, [R. 28]**

The Court now turns to Kawasaki's Motion for Summary Judgment, [R. 28]. Kawasaki first argues that it is entitled to judgment as a matter of law on Plaintiffs' design-defect and failure-to-warn theories because Plaintiffs have failed to offer any evidentiary support for those theories.

*Id.* at 5–7. Plaintiffs concede that they are no longer pursuing their product-liability claim under those theories. [R. 32, pp. 8–10]. Kawasaki further argues that it is entitled to judgment as a matter of law on Plaintiffs' manufacturing-defect theory because Plaintiffs cannot succeed on that theory without expert testimony. [R. 28, pp. 8–10]. Plaintiffs, in response, point only to M.L.D.'s testimony that she was operating the side-by-side properly when "something broke" and to the testimony and affidavit of their now-excluded expert, Mr. Walters.[10] [R. 32, pp. 6–16].

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Pirata P.S.C. v. Bank of Am., NA*, No. 22-CV-627, 2026 WL 2058957, at *7 (W.D. Ky. July 16, 2026) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). That burden may be satisfied by "demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case for which he or she bears the burden of proof." *Id.* (citing *Celotex*, 477 U.S. at 323). When the moving party satisfies its initial burden, the nonmoving party must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Id.* (quoting *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."). Accordingly, the Court will consider whether, in the circumstances of this case, expert testimony is necessary to establish an essential element of

[10] The Court understands that Plaintiffs' other disclosed experts are expected to testify about the injuries sustained in the rollover incident, not the cause of it. *See* [R. 14].

Plaintiffs' product-liability claim. If Plaintiffs' cannot succeed on their claim without expert testimony, then Kawasaki is entitled to judgment as a matter of law.

Under Kentucky state law,[11] the "Kentucky Product Liability Act applies to all damage claims arising from the use of products, regardless of the legal theory advanced." *Bardin v. Nissan Motor Co., Ltd.*, No. 21-CV-144, 2023 WL 6392743, at *11 (W.D. Ky. Sep. 29, 2023) (alteration omitted) (quoting *Monsanto Co. v. Reed*, 950 S.W.2d 811, 814 (Ky. 1997)). The Act "recognizes claims based on defective design, defective manufacture, and failure to warn." *Id.* To prevail under any of those theories, a plaintiff must show, among other things, "that the product had a defect and that the defect caused the alleged damages." *Id.*; *accord Prather v. Abbott Lab'ys*, 960 F. Supp. 2d 700, 706 (W.D. Ky. 2013) ("To recover under any product liability claim, the plaintiff must prove the existence of a 'defect' and legal causation." (quoting *McCoy v. Gen. Motors Corp.*, 47 F. Supp. 2d 838, 839 (E.D. Ky. 1998))).

Under Kentucky law, "expert witnesses are 'generally necessary' to prove the presence of a defect in a products liability action." *Whybark*, 2017 WL 1788673, at *6 (quoting *Honaker v. Innova, Inc.*, No. 4-CV-132, 2007 WL 1217744, at *2 (W.D. Ky. Apr. 23, 2007)). Indeed, expert witnesses are "essential" to prove a product defect unless "the nature of the defect . . . [is] so obvious as to fall within the general knowledge of the ordinary person." *Honaker*, 2007 WL 1217744, at *2 (quoting William S. Hanes, *Kentucky Jurisprudence: Torts* § 21-28 (1987)). In other words, a plaintiff "must put forth expert testimony unless a defect is of the type that the jury can comprehend 'as well as a specially trained expert could.'" *Wells v. Wal-Mart Stores Inc.*, No.

[11] In a diversity case, like this one, Kentucky state law governs the substance of Plaintiffs' product-liability claim. *See, e.g., Hoven v. Walgreen Co.*, 751 F.3d 778, 783 (6th Cir. 2014) ("Under the *Erie* doctrine, in diversity cases we apply the substantive law of the forum state and federal procedural law." (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427 (1996))).

15-CV-69, 2016 WL 1453912, at *1 (E.D. Ky. Apr. 13, 2016) (quoting *Burgett v. Troy-Bilt LLC*, 970 F. Supp. 2d 676, 681 (E.D. Ky. 2013), *aff'd*, 579 F. App'x 372 (6th Cir. 2014)).

A manufacturing defect in the rear-left knuckle of a side-by-side is the kind of defect that can be established only through expert testimony. An ordinary layperson does not know what a knuckle is, let alone how to determine whether one is defective. Just like the bone screw at issue in *Whybark*, it "seems far outside the realm of common experience to have any interaction with [vehicular knuckles]," and the existence of a design defect in such a "specialized [mechanical] device" is "unquestionably not within the realm of knowledge of the ordinary layperson." *See Whybark*, 2017 WL 1788673, at *3. Indeed, courts applying Kentucky law have recognized that expert testimony is necessary to establish defects in products similar to, or even less technical than, the side-by-side at issue here. *See, e.g.*, *id.* (bone screw); *Mayes v. Sig Sauer, Inc.*, No. 19-CV-0146, 2023 WL 2730264, at *9–10 (W.D. Ky. Mar. 30, 2023) (handgun); *Hill v. Express Tan, Inc.*, No. 16-CV-175, 2019 WL 1757534, at *2–3 (W.D. Ky. Apr. 19, 2019) (tanning bed); *Wells*, 2016 WL 1453912, at *2–3 (E.D. Ky. Apr. 13, 2016) (toilet seat); *Honaker*, 2007 WL 1217744, at *2 (pressure cooker). Accordingly, the Court concludes that Plaintiffs in this case cannot establish the existence of a defect in the rear-left knuckle of their side-by-side without expert testimony.

The Court recognizes that there may be circumstances in which a plaintiff can establish a product defect under Kentucky law without expert testimony. It is unclear, however, whether Plaintiffs in this case are arguing that they can establish a defect in the side-by-side based on only non-expert evidence: Plaintiffs' arguments in response to Kawasaki's Motion for Summary Judgment rely almost exclusively on the opinions of Mr. Walters, and Plaintiffs do not cite any product-liability cases in which the plaintiff prevailed without expert testimony. *See* [R. 32]. Nevertheless, given Plaintiffs' assertion that they can prevail on their manufacturing-defect claim

"[i]f the jury believes . . . that [M.L.D.] was operating the [side-by-side] properly and in a safe manner and . . . that something 'broke' on the [side-by-side], causing it to pull immediately to the right towards the guardrail and then immediately flip over," *id.* at 6–7, the Court next addresses whether Plaintiffs' non-expert evidence—namely, M.L.D.'s testimony—could establish a defect in the side-by-side.[12] The Court concludes that it could not.

In considering this question, the Court first looks at basic principles of Kentucky product-liability law. To establish a product defect based on circumstantial evidence, a plaintiff must show that the product malfunctioned and "eliminate[] those causes for which the manufacturer would not be liable." *Siegel v. Dynamic Cooking Sys., Inc.*, 501 F. App'x 397, 401 (6th Cir. 2012). A plaintiff in such a case is "not required to show precisely *how* [the] product [was] defective, but

[12] Although Plaintiffs assert that "[Mr. Walters's] testimony supports [M.L.D.'s] rendition of the causation of the roll over event," [R. 32, p. 7], they appear to be relying exclusively on Mr. Walters's testimony as to a "casting defect" in the knuckle and on statements contained in Mr. Walters's affidavit, *see id.* at 7, 10–16. The Court has excluded both that testimony and that affidavit, and Plaintiffs have identified no other portion of Mr. Walters's testimony that supports their claim of a defect or theory of causation. *See id.* at 6-16. To the extent that Plaintiffs attempt to rely on Mr. Walters's vague opinions that the side-by-side was in good condition and that the knuckle had not been damaged prior to the rollover incident, *see id.* at 11, they have wholly failed to develop this argument. *See, e.g.*, *Alexa v. City of Ann Arbor*, 829 F. Supp. 3d 328, 336 (E.D. Mich. 2026) ("It is not the court's responsibility to construct a party's [summary-judgment] argument[s] from the record or search out facts from the record supporting those arguments." (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989))); *Vasser v. SaarGummi Tenn.*, No. 20-5223, 2021 WL 7084365, at *2 (6th Cir. Sep. 15, 2021) ("It is well settled that the non-moving party must cite specific portions of the record in opposition to a motion for summary judgment, and that the court is not required to search the record for some piece of evidence which might stave off summary judgment." (quoting *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1191 (6th Cir. 1997))). Moreover, any opinion to that effect would be unreliable; Mr. Walters failed to provide any details about which parts of the side-by-side he inspected, why he believed that certain pieces of damage were attributable to the rollover incident rather than to any prior incident, and ultimately, how he formed his conclusory opinions. *See* [R. 28-1, pp. 32:5-36:23, 119:4–21, 122:18–124:4, 139:14–140:1]; *Antioch*, 633 F. App'x at 300 (emphasizing that an expert who relies only on his own experience "must explain how that experience leads to the conclusion reached" (quoting Fed. R. Evid. 702 advisory committee's notes to 2000 amendments)); *In re E. Palestine Train Derailment*, No. 23-CV-242, 2025 WL 326040, at *4 (N.D. Ohio Jan. 29, 2025) (noting that "[i]t is the job of [an] expert to explain how he reached his opinion, on which methodology and facts he relied" and finding that an expert's opinion was unreliable because the expert "fail[ed] to provide proper explanation of his methodology and facts used to reach [that] opinion"); *Eiben*, 2013 WL 1721677, at *14–15 (concluding that an expert's opinion was not reliable when the expert made various "assumptions about [an] accident scenario" and those assumptions led to the expert's conclusion that a product was defective). Finally, even if the Court considered any of these opinions, Plaintiffs would not, for the reasons explained below, be able to establish a genuine issue of material fact as to whether a manufacturing defect caused the side-by-side to roll over. Accordingly, the Court will address only whether M.L.D.'s testimony, standing alone, could establish that a defect caused the rollover incident.

simply must show *whether* it was defective." *Id.* It is not sufficient, however, for the plaintiff to show that a defect *may* have caused the injuries; instead, the plaintiff must put forward evidence that "tilt[s] the balance from possibility to probability." *Hall v. Teleflex, Inc.*, No. 10-CV-270, 2012 WL 124846, at *7 (E.D. Ky. Jan. 17, 2012) (quoting *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 788 (6th Cir. 2005)); *see also Ky. Farm Bureau Mut. Ins. Co. v. Deere & Co.*, No. 07-CV-8, 2008 WL 339622, at *2 ("Evidence that induces mere 'surmise or speculation' does not establish a defect." (quoting *Highway Transp. Co. v. Daniel Baker Co.*, 398 S.W.2d 501, 502 (Ky. 1966))).

The non-expert evidence cited by Plaintiffs in this case—i.e., M.L.D.'s testimony that she was operating the side-by-side 'properly' when it suddenly became uncontrollable and that she later came to understand that the rollover had occurred because "something broke," *see* [R. 31-1, pp. 33:4–34:5, 76:10–77:12]—comes nowhere close to the kind of circumstantial evidence that courts have found sufficient to establish manufacturing defects under Kentucky law.

To begin, the Court has identified only one case involving an alleged defect in a complex machine, such as a motor vehicle, in which the plaintiff established a sufficient probability of a defect without any expert testimony.[13] *See Perkins v. Trailco Mfg. and Sales Co.*, 613 S.W.2d 855, 856–58 (Ky. 1981). In that case, the plaintiff purchased a brand-new trailer for his dump truck. *Id.* at 856. Roughly two weeks later, the plaintiff used the trailer for the first time, properly loading the trailer with slag and preparing it to be dumped. *Id.* at 856–57. Shortly after the plaintiff began to raise the trailer for dumping, the trailer's hydraulic system "made a popping noise" and "the whole trailer and load crashed to the ground." *Id.* at 857. The court held that that evidence alone

[13] While the trial court allowed the plaintiff's expert to testify, the appellate court concluded that, regardless of whether the expert's testimony was considered, there was sufficient evidence of causation to submit the issue to the jury. *Perkins*, 613 S.W.2d at 857–58.

was "of such quality that it might be reasonably inferred that the accident was caused by a defect in the trailer." *Id.* at 858. The court explained that because the trailer was on its "maiden voyage" and was "carrying a proper load and being used in a proper manner," the plaintiff had sufficiently "negate[d]" possible causes for the failure, other than a defect. *Id.*

Although the court in *Perkins* held that expert testimony was not necessary to establish a probability of a defect, the Court has found no other cases involving alleged motor-vehicle defects in which non-expert evidence was deemed sufficient to establish a probability of a defect. To the contrary, expert evidence appears to have been central to the court's analysis in each case finding a sufficient probability of a defect. In *Gentry v. General Motors Corp.*, 839 S.W.2d 576 (Ky. Ct. App. 1992), for example, the plaintiff was properly driving a car when he heard a noise in the rear-left end of the car; the car then pulled suddenly to the left and struck a tree on the side of the road, *id.* at 577. The plaintiff presented expert testimony from a metallurgist and an accident reconstructionist; the metallurgist testified, based on his examination of the car's axle, that "there was an open crack in the casting at the time that the welds were made," and the reconstructionist testified, based on his examination of the car, that "the wheel on the [car] was wobbling around and probably did contact the fender before the car even left the road . . . and that's what caused the accident." *Id.* at 578–79 (internal quotation marks omitted). The court held that the evidence, including the expert testimony, provided a "sufficient quantum of circumstantial evidence to justify a reasonable inference of probability that [the defendant] was responsible for a defect that caused the accident." *Id.* at 579; *see also, e.g.*, *Teleflex*, 2012 WL 124846, at *2–5, *7 (finding sufficient evidence of a manufacturing defect in the steering system of a boat based in part on the expert testimony of a forensic engineer and a metallurgist, each of whom testified that a defect had caused the steering failure); *Deere & Co.*, 2008 WL 339622, at *1–5 (finding sufficient evidence

of a defect when the plaintiff's relatively new tractor caught on fire and the testimony of an expert fire investigator "eliminated potential causes of the fire other than a problem in the fuse box")

Moreover, the Court has found several cases involving alleged motor-vehicle defects where even expert testimony was insufficient to tilt the balance of a defect from possibility to probability. In *Briner v. General Motors Corp.*, 461 S.W.2d 99 (Ky. 1970), for instance, the plaintiff began to experience problems with her new car roughly three months after she bought it; specifically, she complained that the car was "pulling and galloping and there was vibration in it," *id.* at 100 (internal quotation marks omitted). The car was inspected and serviced several times over the course of the next year. *Id.* Roughly seven months after the last service, the plaintiff was driving when "something happened to the car and it started veering to the left," causing her to crash into another car. *Id.* (internal quotation marks omitted). Two experts testified that the crash could have been caused by one of several potential defects, including "incorrect tire balancing, an improperly mounted air conditioner compressor, misalignment, or a loose or broken bearing." *Id.* at 101. The court held, however, that the plaintiff had not presented sufficient evidence to "prove a basis for liability against either [the manufacturer or the servicer]." *Id.* at 100. The court explained that "[c]onsidering the length of time that elapsed after [the servicer's] last servicing of the automobile, the mileage driven, the uncertain character of the cause of the accident, we are too far out in the realm of conjecture to have a proven case of liability" and that those reasons "applie[d] equally, if not more so, to [the manufacturer]." *Id.* at 102–03; *see also Cox v. Gen. Motors Corp.*, 514 S.W.2d 197, 199–200 (Ky. 1974) (reaching a similar conclusion for similar reasons, noting also that the car had been "driven in excess of 23,000 miles"); *Greene*, 409 F.3d at 789, 791–94 (holding that a district court erred by denying judgment as a matter of law to a defendant manufacturer in a case

involving an alleged defect in a helicopter's gyroscope, notwithstanding the testimony of a "helicopter expert" that such a defect had caused the helicopter to crash).

Viewed in light of these decisions, the non-expert evidence cited by Plaintiffs in this case—which, again, consists of no more than M.L.D.'s testimony that she was driving the side-by-side properly and that "something broke"—is plainly insufficient to create a "probability" of a manufacturing defect. Indeed, Plaintiffs' evidence in this case is significantly weaker than that in *Briner*, where the court concluded that the plaintiff was "too far out in the realm of conjecture to have a proven case of liability." 461 S.W.2d at 102. For example, Plaintiffs in this case had used their side-by-side for roughly eleven months after its purchase when the rollover occurred, four months longer than the gap between the car's most recent service and the crash in *Briner*. *See* [R. 28-4, pp. 6:18–25, 19:5–11, 37:15–19]; *Briner*, 461 S.W.2d at 100; *cf. Perkins*, 613 S.W.2d at 858 (emphasizing that the trailer was "new" and on its "maiden voyage" when it malfunctioned). Moreover, the "character of the cause of the accident" in this case is even less "certain" than that in *Briner*, where the plaintiff's expert had at least hypothesized as to various defects could have caused the crash. *See Briner*, 461 S.W.2d at 101. Here, the only non-expert evidence that Plaintiffs have identified regarding the cause of rollover is M.L.D.'s belief, of unclear origins and no clear support, that "something" on the side-by-side "broke." *See* [R. 32; R. 31-1, pp. 76:10–77:12]; *cf. Gentry*, 839 S.W.2d at 578–79 (explaining that the plaintiff established a sufficient probability of a defect when a metallurgy expert testified to the existence of a specific defect in the car's axle and an accident-reconstruction expert testified that the accident was consistent with a broken axle). Put simply, Plaintiffs' evidence would require the jury to "speculate whether the product malfunctioned, whether the malfunction was caused by a defect, whether the product was operated correctly, whether it was property maintained, or to theorize as to any other possibilities."

*Honaker*, 2007 WL 1217744, at *2. Because that kind of "inference-stacking may not be the basis establishing defect or causation," *Deere & Co.*, 2008 WL 339622, at *3 (citing *Briner*, 461 S.W.2d at 102), Plaintiffs' non-expert evidence is not sufficient for the jury to find that a "probability" of a defect, *see Greene*, 409 F.3d at 788.

In sum, the existence of a defect is an essential element of Plaintiffs' product-liability claim, and Plaintiffs cannot, in the circumstances of this case, establish a defect without expert testimony. The Court has excluded the testimony of Plaintiffs' only relevant expert, Mr. Walters, and summary judgment on Plaintiffs' claim is therefore appropriate.[14] *See, e.g.*, *Rose v. Truck Ctrs., Inc.*, 388 F. App'x 528, 536 (6th Cir. 2010); *Whybark*, 2017 WL 1788673, at *6; *Eiben*, 2013 WL 1721677, at *16. Accordingly, the Court will grant Kawasaki's Motion for Summary Judgment.

## III. CONCLUSION

For the reasons set forth above, the Court will grant each of Kawasaki's motions. Accordingly, the Court being sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. Defendant Kawasaki Motors Corp., U.S.A.'s Motion to Exclude the Affidavit of Chris Walters, [**R. 34**], is **GRANTED**.
2. Defendant's Motion to Exclude Plaintiffs' Proposed Expert, Chris Walters, [**R. 27**], is **GRANTED**.
3. Defendant's Motion for Summary Judgment, [**R. 28**], is **GRANTED**.

[14] Although Plaintiffs, in their complaint, appear to assert theories of strict liability, negligence, and breach of warranty related to their product-liability claim, *see* [R. 1-2], the parties' briefs do not discuss any of those theories, either separately or together, *see* [R. 28; R. 32; R. 35]. In any event, the existence of a defect is a prerequisite to Plaintiffs' success on any of their three theories, *see, e.g.*, *Bardin*, 2023 WL 6392743, at *11; *Prather*, 960 F. Supp. 2d at 706. Because the Court concludes that Plaintiffs have not put forth sufficient evidence to establish the existence of a defect, the Court need not discuss each specific theory of liability.

4. A separate judgment shall be entered contemporaneously with this Memorandum Opinion and Order.

This the 14th day of September, 2026.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY